IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LASHEIK LEE                          :

                                 :

    v.                        :   Civil Action No. 22-957

                                 :

BOARD OF EDUCATION FOR
PRINCE GEORGE'S COUNTY, et al.  :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, are a motion for summary judgment filed by Plaintiff LaSheik Lee ("Plaintiff"), (ECF No. 44), and a cross-motion for summary judgment filed by Defendants Board of Education for Prince George's County and Dr. Monica Goldson ("Defendants"), (ECF No. 47). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion for summary judgment will be denied, and Defendants' cross-motion for summary judgment will be granted.

## I.  Background

### A. The Individuals with Disabilities Education Act

The IDEA, 20 U.S.C. §§ 1400 *et seq.*, and its accompanying regulations, 34 C.F.R. §§ 300 *et seq.*, require states that receive federal education funds to make available to each child between

the ages of three and twenty-one who has a disability a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A). Maryland also has regulations governing the provision of FAPEs to children with disabilities in accordance with the IDEA.  Md. Code Regs. 13A.05.01.  A FAPE is satisfied if a local education agency[1] provides "specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 201 (1982).  The United States Supreme Court has established a two-part inquiry to analyze whether a local education agency satisfied its obligation to provide a FAPE:

> First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206-07.  Thus, to receive relief, a plaintiff must show both that the school district procedurally violated the IDEA and that the defect "had an adverse effect on [the child's] education." *T.B., Sr. ex rel. T.B., Jr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018).

---

[1] This opinion uses the term "local education agency" interchangeably with "school district."

To ensure delivery of a FAPE, local education agencies are required to prepare and implement an appropriate individualized education program ("IEP") for each child determined to have a disability. 20 U.S.C. § 1414(d). An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" by the child's "IEP Team," which is composed of the child's parents, teachers, a representative of the local education agency, and others. § 1414(d)(A)-(B). The IEP must contain statements about the child's current educational performance, the annual goals for the child's education, the special educational services and other aids that will be provided to the child, and the extent to which the child will spend time in school environments with non-disabled children, among other things. § 1414(d)(1)(A). The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). Additionally, the child must be educated in the "least restrictive environment," which means that the child must be "educated with children who are not disabled" "[t]o the maximum extent appropriate" and only removed from the "regular educational environment . . . when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." § 1412(a)(5).

3

The IDEA requires that states establish certain "Procedural Safeguards" that are "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions." *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997) (citing § 1415). These safeguards include a process by which parents can file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." § 1415(b)(6). Once they have filed a complaint, parents are entitled to an "impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency." § 1415(f)(1)(A). In Maryland, due process hearings are conducted by an Administrative Law Judge ("ALJ") at the Maryland Office of Administrative Hearings. *See* Md. Code Ann., Educ. § 8-413; Md. Code Regs. 13A.05.01.15(C). If parents are dissatisfied with the findings and decision made by the ALJ, they have a right to bring a civil action with respect to their due process complaint in state or federal court. § 1415(i)(2)(A). Under those circumstances, the parents bear the burden of proof both in the administrative hearing and before the state or federal court. *See Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004) ("[P]arents who challenge an IEP have the burden of proof in the

4

administrative hearing."); *Bd. of Educ. of Montgomery Cnty. v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 705 (D.Md. 2000) ("[P]arties aggrieved by the administrative decision may file suit in federal district court, [and] [t]he burden of proof is on the party challenging the administrative decision.").

When a court determines by a preponderance of the evidence that a local education agency has failed to provide a FAPE to a child with a disability, the court is authorized to "grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii). Courts enjoy "broad discretion" in fashioning relief, and "equitable considerations are relevant" in doing so. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 374 (1985). The United States Court of Appeals for the Fourth Circuit has held that "[a]vailable relief includes the discretionary remedy of compensatory education, which is intended to remedy an 'educational deficit' caused by a school's prior failure to provide a FAPE to a disabled student." *Johnson v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 20 F.4th 835, 840 (4th Cir. 2021) (quoting *G ex rel. RG v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 309 (4th Cir. 2003)).

Plaintiff raises a long list of issues with the decision of Administrative Law Judge Michael R. Osborn ("the ALJ"), including that the administrative due process hearing was not regularly made and that the ALJ erred when he determined that the student was not

5

in need of compensatory services because the school district failed materially to implement the IEPs during the period from March 13, 2020, through January 11, 2021; the school district denied Plaintiff the opportunity to participate meaningfully prior to reducing the special education and related services in the November 12, 2019 IEP; the school district failed to consider private evaluations provided in August 2020 when developing the October 29, 2020 IEP; the school district failed to develop appropriate IEPs addressing the student's anxiety, school avoidance, and academic needs; the school district failed to address appropriately the student's school avoidance and anxiety behaviors during the period of March 2020 through January 11, 2021; and the school district failed to grant Plaintiff's request for independent education evaluations or file for due process.   She seeks, in addition to a declaration of various violations, an order requiring Defendants to fund compensatory education, damages for expenses incurred, costs, expenses, and attorney's fees.

### B. Factual Background

Unless otherwise noted, the following facts are drawn from the ALJ's Findings of Fact.[2]   (ECF No. 1-1, at 17-105).   The relevant facts are not in dispute.   C.L.-W. was enrolled in Prince

---

[2] As the court explains below, there is no evidence that the ALJ's findings were not regularly made.   Thus, these findings are prima facie correct.   *See Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

George's County Public Schools ("PGCPS") by his mother, Plaintiff, starting in pre-kindergarten.  He attended Suitland Elementary School ("SES") for elementary school and Drew Freeman for middle school.  At a December 16, 2015 IEP meeting, PGCPS created C.L.-W.'s first IEP, which stated that his learning disability was "Specific Learning Disability."  The areas affected by the C.L.-W.'s learning disability were cognitive and academic, including math calculation, reading phonics, speech and language expressive language, speech and language receptive language, and written language expression.  Among others, accommodations and modifications included: small group instruction, use of graphic organizers, use of online reading and writing programs, and use of shorter passages of text.

Prior to February 23, 2016, C.L.-W.'s pediatrician referred him to Dr. Karen Alexis Spencer, M.D., of Children's National Medical Center ("Children's National"), for evaluation due to his language development issues.  On March 4, 2016, Dr. Spencer recommended that C.L.-W. participate in speech therapy weekly with speech therapist Pappas at Children's National, school-based speech therapy at least twice weekly, and behavioral therapy.

In the fall of C.L.-W.'s fifth grade year, he took the SLO and MAP-R standardized tests.  His scores showed he was performing below grade level in reading, writing, and mathematics.  On October 2, 2018, Rose Idris, M.Ed., a special educator, conducted an

assessment in the areas of academics, cognitive, and social and emotional behaviors.  His scores were average to below average. On October 15-16, 2018, Yvonne Moulton, M.S., a speech and language pathologist, conducted an assessment of C.L.-W.'s receptive language, expressive language, articulation, oral structuring and functioning, fluency, and voice abilities.  His scores were average to below average.  On October 8, 2018, Jennifer Bruce, Psy.S., conducted a psychological evaluation of C.L.-W. concluding that he had a low average ability to perform complex mental processes that involve conceptualization and transformation of information.

C.L.-W.'s IEP team met on November 13, 2018.  The team meeting was attended by Plaintiff, Ms. Idris (special education teacher), Ms. Bruce (psychologist), SES Assistant Principal Parnell, Ms. Carlotta Chalkley-Legette (C.L.-W.'s special education teacher), and Ms. Moulton (speech and language pathologist).  The IEP team considered and reviewed the supports in place to access the curriculum and the success of those supports.  The IEP team also considered:  the assessments of Ms. Idris, Ms. Bruce, and Ms. Moulton; C.L.-W.'s classroom performance; observations of general educators; C.L.-W.'s proficiency in language and math; C.L.-W.'s academic grades, and C.L.-W.'s performance on state-wide assessments.  The November 13, 2018 IEP specified that C.L.-W. required no assistive technology.  It provided for instructional and assessment accessibility features including

- Graphic organizer for use in instruction, only;
- Text to speech for English language arts and literacy, math, science, and all assessments;
- Instruction time to teach/learn the use of speech to text technology;
- Frequent breaks for daily instruction and all state-wide educational assessments; and
- Reduced distractions for daily instruction and all assessments.

The November 13, 2018 IEP provided for instructional and assessment accommodations including

- Text to speech for English language arts/literacy for daily instruction and the PARCC assessment and Maryland State Alternative Assessment;
- Human reader for daily instruction and for the Maryland State Alternative Assessment, but not the PARCC Assessment;
- Calculation device and mathematics tools (cubes, number lines, charts, blocks, and graphic organizers) for daily instruction, the PARCC assessment and Maryland State Alternative Assessment;
- Monitored test responses in daily instruction and all assessments; and
- Extended time in daily instruction and on all assessments, except the Maryland State Alternative Assessment.

The November 13, 2018 IEP also provided for supplementary aids, services, program modifications, and supports including

- Repetition of directions, daily, as needed, by C.L.-W.'s general education teacher, special education teacher, and instructional aide;
- Check for understanding, daily, as needed, by C.L.-W.'s general education

9

teacher, special education teacher, and
instructional aide;

- Allow use of manipulatives, such as
  sentence starters, paragraph frames,
  preheaded papers, personal word boxes or
  dictionary, place value cards to aid math
  calculations, daily, as needed, by C.L.-
  W.'s general education teacher, special
  education teacher, and instructional
  aide;

- Repeat or paraphrase information, daily,
  as needed, by C.L.-W.'s general education
  teacher, special education teacher,
  instructional aide and IEP team;

- Frequent and/or immediate feedback,
  daily, as needed, by C.L.-W.'s general
  education teacher, special education
  teacher, instructional aide or IEP team;
  and

- Altered/modified assignments, such as
  classwork, homework, assessments
  modified by reduced choices in selected
  response tests, oral assessment,
  assignments on C.L.-W.'s instructional
  level, less complexity in visual formats
  in work and tests, daily, by C.L.-W.'s
  general education teacher, special
  education teacher, instructional aide,
  and IEP team.

The November 13, 2018 IEP set one goal and two objectives each in

the areas of reading comprehension, math calculation, written

language expression, and speech and language expressive language,

to be accomplished by November 2019.  Finally, the IEP specified

that C.L.-W. must receive (1) special education in the general

education classroom for one hour per day, five days per week; (2)

special education outside the general education classroom for 30

minutes per day, four days per week; and (3) related services in

speech/language therapy outside the general education classroom for 30 minutes three times per month.

On December 13, 2018, Plaintiff and C.L.-W. visited Lakeasha Hart-Tribune, LCSW-C, at All That's Therapeutic to obtain mental health services for C.L.-W.  Ms. Hart-Tribune concluded that C.L.-W. met the diagnostic criteria for Unspecified Disruptive, Impulse-Control, and Conduct Disorder based on his defiant, disruptive, and oppositional behavior in the home, and his refusal to respect Plaintiff's authority.  On January 7, 2019, Dr. Carlos Estrada, M.D., an All That's Therapeutic psychiatrist, evaluated C.L.-W., and concluded that he had an "other conduct disorder" based on his temper tantrums and aggressive behaviors.  On February 4, 2019, C.L.-W. met with Angela Jones, B.A., an All That's Therapeutic psych assistant, to develop an individual treatment plan.

On a November 20, 2018 progress report, C.L.-W. made progress toward his speech and language expressive language goal of the November 13, 2018 IEP.  On a January 18, 2019 progress report, he made progress toward his reading comprehension and math calculation objectives, and slow progress toward his written language expression goal.  On a February 6, 2019 progress report, he made progress toward his speech and language expressive language goal.  On a March 29, 2019 progress report, he made progress toward his reading comprehension and math calculation objectives and

11

written language expression goal.  On a May 25, 2019 progress report, he made progress toward a reading comprehension objective. On an April 11, 2019 progress report, he made progress toward his speech and language expressive language goal.  On a June 6, 2019 progress report, he made progress toward a reading comprehension objective and his math calculation and written language expression goals.  On a June 10, 2019 progress report, he made progress toward his speech and language expressive language goal.

C.L.-W. took the MAP-Rs standardized test five times over the course of fifth and sixth grades and performed at a third grade reading level each time.  He took the SLO standardized test in fall 2018 and spring 2019 during his fifth-grade year.  From fall to spring, his scores showed improvement in reading and math but no improvement in writing.  He took the Maryland Comprehensive Assessment Program assessment on April 25, 2019 and his score indicated that he did not yet meet expectations.  At the end of C.L.-W.'s fifth grade year, he earned a B in reading, C in oral and written communication, and C in math.

On August 1, 2019, between fifth and sixth grades, Plaintiff emailed SES Principal Preston expressing disagreement with C.L.-W.'s special education evaluations.  She requested an independent educational evaluation ("IEE").  On September 16, 2019, Trinell M. Bowman, Defendants' director of special education, wrote a letter to Plaintiff stating that Defendants would fund an IEE for C.L.-

W. in three areas of academics (reading, mathematics, and written language).  Also on September 16, 2019, Ms. Bowman wrote a second letter to Plaintiff stating that Defendants had decided to defend their evaluations in the areas of psychology, speech and language, and occupational therapy.  On October 23, 2019, Ms. Bowman wrote a third letter to Plaintiff stating that Defendants would fund a psychological IEE, but would not fund an occupational therapy IEE. In this letter, Ms. Bowman did not state whether Defendants would fund a speech and language IEE.[3]  Plaintiff disputes receiving the third October 23, 2019 letter.  (ECF No. 44-1, at 3).  Although Ms. Bowman wrote that Plaintiff must arrange the approved IEEs within 90 days and provide them to C.L.-W.'s school, Plaintiff did not arrange any of the approved IEEs or provide the results to Defendants within 90 days.

On September 13, 2019, Dr. Alecia Tucker, M.D., filled out a form used by Defendants to capture health information about students.  In the "concern" section of C.L.-W.'s form, she wrote "learning disability—reading/writing and comprehension, anxiety." Although Defendants store this type of form in a digital archive,

---

[3] The ALJ incorrectly found that in the October 23, 2019 letter, Ms. Bowman wrote that Defendants would fund a speech and language IEE for C.L.-W.  In fact, Ms. Bowman wrote that Defendants would fund a speech and language IEE for C.L.-W.'s *brother*. Because this error is relatively minor, it does not cause the court to conclude that the ALJ's findings were irregularly made.

C.L.-W.'s form cannot be found in Defendants' nurse's office records.

In fall 2019, at the beginning of C.L.-W.'s sixth grade year, he took a MAP-R standardized test.  His score showed an improvement from his spring 2019 score.

C.L.-W.'s IEP team met on November 12, 2019.  The IEP meeting was attended by Plaintiff, Ms. Chalkley-Legette (C.L.-W.'s special education teacher and case manager), Ms. Idris (special education teacher), Ms. Moulton (speech and language pathologist), Ann Cutler (general education teacher), Tishuana Deville (general education teacher), SES Assistant Principal Parnell, and SES Principal Preston.  The IEP team reviewed C.L.-W.'s standardized assessment scores from the 2018 Triennial Assessment; specific learning disability of dysgraphia; current class performance data; MCAP scores of April 25, 2019; MAP-R assessment results from fall 2019; SLO Assessment results from fall 2019; teacher input; and classroom observation.  The specific learning disability, areas affected by the specific learning disability, and areas identified for reevaluation in the November 12, 2019 IEP were identical to those in the November 13, 2018 IEP.  The instructional and assessment accessibility features of the November 12, 2019 IEP were the same as those in the November 13, 2018 IEP, except a human reader was removed.  The use of text-to-speech services remained.  Like the November 13, 2018 IEP, the November 12, 2019 IEP did not

require assistive technology.  The instructional and assessment accommodations were identical, except extended time was defined as 1.5x, while the November 13, 2018 IEP had no limit on extended time.  The November 12, 2019 IEP included similar supplementary aids, services, program modifications, and supports to those in the November 13, 2018 IEP, with the addition of a scribe.  The IEP set one goal and two objectives each in the areas of reading comprehension, math calculation, written language expression, and speech and language expressive language, to be accomplished by November 2020.  Finally, the IEP specified that C.L.-W. must receive (1) special education in the general education classroom for one hour per day, five days per week; (2) special education outside the general education classroom for 30 minutes per day, four days per week; and (3) related services in speech/language therapy outside the general education classroom for 30 minutes three times per month.

In 2020, Plaintiff arranged evaluations in speech language, occupational therapy, and psychology.  First, on January 7, 2020, Lindsay Burger, M.A., a clinical fellow in speech language pathology at Impressions Pediatric Therapy, conducted a medical speech language evaluation of C.L.-W.  She issued a report finding C.L.-W.'s performance below average in word classes and formulated sentences, and average in recalling sentences and semantic relationships.  Ms. Burger did not review any of C.L.-W.'s

15

schoolwork and did not speak to any of his general education or special education teachers or his speech language therapist, Ms. Marcella Coleman, in conducting her evaluation or composing her report.  Ms. Burger reported that C.L.-W. had a mild expressive and receptive language disorder.  She recommended speech therapy sessions of 30 minutes, once per week, for an undetermined length of time.  Plaintiff provided Ms. Burger's report to Defendants on an unknown date.

Second, on January 10, 2020, occupational therapist Beverly Neway, M.A., evaluated C.L.-W.  Ms. Neway reported that C.L.-W.'s fine motor skills were three years lower than his chronological age, and that he had difficulty in accurately folding paper, connecting dots, and drawing lines within boundaries of simple mazes.  Ms. Neway found that C.L.-W. demonstrated visual motor integration skills in the low range, with skills equivalent to a child of seven years, six months, and opined that his visual motor integration skills would impact his ability to form letters and numbers.  She reported that he had difficulty with hand-eye coordination and functional tasks like handwriting, scissoring, and copying.  Ms. Neway recommended that occupational therapy services be provided once per week, in a school setting, to improve his fine motor precision and integration skills.  On August 21, 2020, Plaintiff emailed Ms. Neway's report to Tamala Smith, a seventh-grade guidance counselor at Drew Freeman.  On the same

16

day, SES Principal Preston responded to Plaintiff: "Got it." Principal Preston did not forward the report to the Drew Freeman IEP team.

Third, on or about February 18, 2020, John A. Patton, Psy.D., of BASICS Group Practice, LLC, assessed C.L.-W.'s intellectual functioning.  C.L.-W. scored average in receptive language; low average in reading comprehension, numerical operations, math fluency, and sentence combining; extremely low average in sentence building; within expected limits in oral word fluency and expressive vocabulary; and very low in spelling.  Dr. Patton wrote that C.L.-W. "presents with some symptoms of depression and anxiety, and some conduct problems that appear to be more prevalent at home than at school."  Dr. Patton concluded that C.L.-W. met the diagnostic criteria for generalized anxiety disorder and specific learning disorder with impairments in reading, written expression, and math.  On August 21, 2020, Plaintiff emailed Dr. Patton's report to Ms. Smith, a seventh-grade guidance counselor at Drew Freeman.  The ALJ found that Plaintiff did not ask Ms. Smith to forward the report to a special educator or IEP team, but Plaintiff argues she emailed the report with the understanding that Ms. Smith would forward it to the IEP team.  (ECF No. 44-1, at 5).

On March 12, 2020, Maryland Governor Lawrence Hogan ordered Maryland public schools, which includes PGCPS, to close starting

17

March 16, 2020, to protect the public health by limiting the spread of the COVID-19 virus.  The schools remained closed for the fourth quarter of C.L.-W.'s sixth-grade year and all of his seventh-grade year.

On April 9, 2020, Ms. Chalkley-Legette, C.L.-W.'s special education teacher and special education coordinator at SES, sent an individualized continuity of learning plan ("ICLP") for C.L.-W. to Plaintiff by email and via PGCPS's online parent-teacher communication system.  Ms. Chalkley-Legette advised Plaintiff that the ICLP would be in effect for the duration that schools were closed due to COVID-19 and was based on C.L.-W.'s current IEP.  Ms. Chalkley-Legette advised Plaintiff that once the school was able to resume normal programming, the services in C.L.-W.'s IEP would be implemented in their entirety, and that when schools reopened, the IEP team would reconvene to review his performance or needs and make appropriate revisions to the IEP.  On April 20, 2020, Ms. Chalkley-Legette and Plaintiff discussed the ICLP on a phone call.  The ALJ found that Plaintiff had no objections to the ICLP, which Plaintiff disputes.  She argues she objected to a reduction of services.  (ECF No. 44-1, at 4).

The ICLP included one language goal and one math goal, each with one objective.  It included fewer accommodations and supplementary aids than did the November 12, 2019 IEP.  It provided for online services with special education supports for 30 to 45

18

minutes per week, and speech language consultations for 15 minutes, twice per month.

The ALJ found that C.L.-W. attended every scheduled session with Ms. Chalkley-Legette from March 2020 through June 2020, except one in June 2020. Plaintiff disputes this finding, arguing that C.L.-W. did not frequently attend virtual learning, and that no virtual instruction sessions were held until April 21, 2020. (ECF No. 44-1, at 4) (citing ECF No. 42-60, at 146). The ALJ concluded that during virtual instruction, C.L.-W. received specialized instruction in reading and math and received special education supports.

On a February 6, 2020 progress report, C.L.W. made progress toward his speech and language expressive language goal in his November 12, 2019 IEP. On a February 7, 2020 progress report, he made progress toward his reading comprehension and math calculation goals, and limited progress toward his written language expression goal. On a March 13, 2020 progress report, he made progress toward his reading comprehension and math calculation goals, and limited progress toward his written language expression goal. On a March 16, 2020 progress report, he made progress toward his speech and language expressive language goal. On a June 11, 2020 progress report, he made progress toward his reading comprehension, math calculation, written language expression, and speech and language expressive language goals. On

19

an October 30, 2020 progress report, he made progress toward his reading comprehension, math calculation, and written language expression goals.  By November 5, 2020, he achieved his speech and language expressive language goal.  Plaintiff disputes that C.L.-W. made progress toward his goals and objectives.

All That's Therapeutic referred C.L.-W. to the Center for Children to provide wrap-around services to C.L.-W. and Plaintiff. On August 21, 2020, Adrienne Gunn at the Center for Children, C.L.-W.'s care coordinator, completed a Plan of Care, which included: a diagnosis of Other Conduct Disorder; a brief history; triggers; potential crises; action steps at home, school, and in the community; a needs statement; an outcome; and strategies.  Since July 2020, C.L.-W. has been receiving 7.5 hours per month of Center for Children services.  Ms. Gunn attended the October 29, 2020 IEP team meeting and advocated for C.L.-W.

C.L.-W.'s IEP team met on October 29, 2020.  The IEP meeting was attended by Plaintiff, Ms. Mason (IEP case manager), Ms. Yasmeen Howell (special education coordinator), Ms. Coleman (speech language pathologist), Ms. Samantha Boehmer-Heafey (special education coordinator), and Ms. Gunn (C.L.-W.'s care coordinator at the Center for Children).  The IEP team reviewed C.L.-W.'s new assessment results; available classroom data; observations of general educators; observations of special educators; the ongoing concerns about C.L.-W.'s performance in

reading, math, and written language; MAP-R assessment results from
fall 2019; MCAP scores from April 29, 2019; and the results of the
WJ-IV administered as part of the Triennial Assessment in fall
2018.  Prior to the October 29, 2020 IEP meeting, the IEP team had
not seen Dr. Patton's psychological report or Ms. Neway's
occupational therapy report.  The IEP team determined that C.L.-
W.'s work completion, lack of participation, and absences were
causing his math skills to stagnate.  They also eliminated direct
speech and language pathology services and substituted a consult
based on his progress.  Plaintiff expressed that C.L.-W. had
anxiety attacks before leaving for school, which affected his
attendance.  Ms. Gunn said that C.L.-W.'s anxiety affects his
performance and encouraged teachers to be aware of how he perceives
teacher tone.  Like the November 13, 2018 and November 12, 2019
IEPs, the October 29, 2020 IEP did not require assistive
technology.  The instructional and assessment accommodations were
the same as those in his November 12, 2019 IEP except they no
longer included text-to-speech or a human reader.  Changes to the
October 29, 2020 IEP supplementary aids, services, program
modifications and supports included:  elimination of a scribe;
elimination of graphic organizers; elimination of small group
instruction in the general education classroom; and elimination of
altered/modified assignments.  The October 29, 2020 IEP added a
word bank, monitoring of independent work, and chunking of text

across all content areas.[4]  It also changed the dynamic for repetition and paraphrasing to the teacher asking C.L.-W. to repeat and rephrase rather than the teacher performing the repetition and rephrasing.  The IEP set one goal and two or three objectives each in the areas of reading comprehension, math calculation, and written language expression, to be accomplished by October 2021.  It did not set any goals or objectives in speech and language expressive language given C.L.-W.'s improvement in that area.  Finally, the IEP specified that C.L.-W. must receive (1) special education in the general education classroom for 17 hours and 55 minutes per week in reading, math, and science; and (2) special education in the general education classroom for 11 hours and 40 minutes per month in social studies.  Related services in speech/language therapy were removed, except for the consults.

On a November 6, 2020 progress report, C.L.-W. made progress toward his reading comprehension goal of the October 29, 2020 IEP and objective of the ICLP.  On a February 5, 2021 progress report, C.L.-W. made progress toward his written language expression and math calculation goals of the October 29, 2020 IEP and objectives

---

[4] "Chunking" is "breaking down the presentation and pacing of your curriculum in a way that reduces the cognitive load on your students.  Breaking your course materials into units, using formatting tools to make long documents more accessible, and using presentation techniques to convey importance are all a part of chunking your course materials." *Chunking, Scaffolding, Pacing*, UNIVERSITY OF WASHINGTON TACOMA (2024), https://perma.cc/TH2U-34FM.

of the ICLP.  On a March 5, 2021 progress report, C.L.-W. made progress toward his reading comprehension goal of the October 29, 2020 IEP and objective of the ICLP.

Starting in pre-kindergarten, C.L.-W. was often tardy or absent.  On December 16, 2019, James W. Huntley, Ed.D., pupil personnel worker, wrote a letter to Plaintiff reminding her that it was her responsibility to ensure that C.L.-W. attended school every day that school was in session and that all absences must be explained, in writing, to SES or his absence would be considered unlawful.  C.L.-W. was absent 36 days in fifth grade, 29 days in sixth grade, and 45 days in seventh grade.  He did not express any signs of anxiety to his educators about attending school.  In their evaluations, neither Ms. Burger, Ms. Neway, nor Dr. Patton commented that the results of their evaluations were in any way affected by test anxiety.  Plaintiff did not tell anyone she was having trouble getting C.L.-W. out of the car at school.  C.L.-W. was well-behaved in school and had no behaviors that interfered with his learning or the learning of others.

### C. Procedural Background

On January 11, 2021, Plaintiff filed a due process complaint with the Office of Administrative Hearings ("OAH") requesting a hearing to review the identification, evaluation, or placement of C.L.-W. by PGCPS under the IDEA.  20 U.S.C. § 1415(f)(1)(A) (2017); 34 C.F.R. § 300.511(a) (2019); Md. Code Ann., Educ. § 8-413(d)(1)

(2018); Code of Maryland Regulations (COMAR) 13A.05.01.15C(1). The complaint primarily requested compensatory education services, attorneys' fees, monetary fees, and fees for expert witnesses for the school district's purported failure to provide C.L.-W. with a FAPE during the 2018-2019, 2019-2020, and 2020-2021 school years. On February 24, 2021, the ALJ held a telephone prehearing conference, which Plaintiff did not attend, where the parties were unable to resolve their dispute.  The ALJ held the due process hearing by video conference for a total of about 63 days between April 6, 2021 and November 22, 2021.

The ALJ framed the issues presented to him as follows:

> (1)   Did the PGCPS deny the Student a FAPE when it changed his placement from an in-person general education setting to a virtual-learning-at-home education setting without considering his individual needs, and without first convening an IEP meeting to allow the Parent an opportunity to meaningfully participate in the placement decision, during the period March 2020 to the present;[5]
> (2)   Did the PGCPS deny the Student a FAPE and violate the Child Find provisions of the IDEA when it failed to consider the Student's need for special education and related services after receiving private occupational therapy,

---

[5] According to the ALJ, "[t]he issue as stated in the Prehearing Conference Report and Order was 'from March 2019 to present,' clarified during the hearing as March 2020 to January 11, 2021, the date the Complaint was filed."  (ECF No. 1-1, at 116).

psychological        and        educational
evaluations in August 2020;
(3)     Did the PGCPS deny the Student a
FAPE by failing to fully implement his
IEP for the period March 2020 to the
present;[6]
(4)     Did the PGCPS deny the Student a
FAPE by failing to develop an appropriate
IEP for the period January 11, 2019
through January 11, 2021;
(5)     Did the PGCPS deny the Student a
FAPE by failing to address or provide
supports relating to the Student's
behavioral issues from January 11, 2019,
through January 11, 2021;
(6)     Did the PGCPS deny the Student a
FAPE when it failed to grant the Parent's
request for an Independent Education
Evaluation or file a due process
complaint to defend its decision not to
grant the request; and,
(7)     If the answer to any of (1) through
(6) above is "yes," is compensatory
education and related services provided
by private providers an appropriate
remedy?

(ECF No. 1-1, at 7).   On December 20, 2021, the ALJ issued his

opinion in the case.   He concluded that Plaintiff had failed to

prove that Defendants did not offer C.L.-W. a FAPE for the 2018-

2019, 2019-2020, and 2020-2021 school years, and subsequently

denied her request for compensatory education services and fees.

Plaintiff filed a complaint in this court on April 19, 2022,

naming the Board of Education for Prince George's County Public

Schools; Prince George's County Public Schools; Dr. Monica

---

[6] Similarly, the ALJ noted that this issue was "[c]larified
at the hearing to January 11, 2019, to January 11, 2021." (ECF
No. 1-1, at 127).

Goldson, CEO of Prince George's County Public Schools; and Trinell Bowman, superintendent for special education of Prince George's County Public Schools as defendants.  On June 9, 2022, Prince George's County Public Schools filed a motion to dismiss.  On January 4, 2023, Judge Hazel dismissed the action as to Trinell Bowman and Prince George's County Public Schools.  The case was reassigned to the undersigned on February 24, 2023.  On March 21, 2023, Plaintiff filed a motion for voluntary dismissal, which the undersigned denied on March 27, 2023.  On June 8, 2023, Plaintiff filed a motion for summary judgment.  On August 10, 2023, Defendants filed a cross-motion for summary judgment.  Plaintiff responded in opposition on October 2, 2023, and Defendants replied on November 17, 2023.

## II.  Standard of Review

In IDEA cases, reviewing courts make "a bounded, independent decision"—that is, "bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Doyle*, 953 F.2d at 103 (quoting *Town of Burlington v. Dep't of Educ. for Com. of Mass.*, 736 F.2d 773, 791 (1st Cir. 1984), *aff'd sub nom. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985)).  The Fourth Circuit articulated the standard of review for motions for summary judgment in IDEA cases in *M.M. ex*

*rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523 (4th Cir. 2002):

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving due weight to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities.

*M.M.*, 303 F.3d at 530-31 (internal citations and quotation marks omitted).

After giving due weight to the administrative findings of fact, the reviewing court may conclude "that the evidence considered as a whole pointed to a different legal conclusion than that reached by the" ALJ. *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). Additionally, pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014); *see also R.S. v. Smith*, No. 20-cv-1300-PX, 2021 WL 3633961, at *7 (D.Md. Aug. 17, 2021). A reviewing court, however, cannot "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility." *Doyle*, 953 F.2d at 104 (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1086 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976).

The general standards of review for summary judgment motions also apply:  The moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  In determining whether a moving party has made that showing, a court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Where, as here, cross-motions for summary judgment have been filed, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Bollech v. Charles Cnty.*, 69 F.App'x 178, 180 (4th Cir. 2003) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)).

## III. Analysis

### A. Presumption of Correctness

When reviewing state administrative decisions in IDEA cases, findings of fact by the ALJ are entitled to a presumption of correctness if they are "made in a regular manner and have evidentiary support." *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 457 (D.Md. 1999) (citing *Doyle*, 953 F.2d at 105). "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding

process.'" *Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4ᵗʰ Cir. 2005) (quoting *Doyle*, 953 F.2d at 104. The Fourth Circuit has found a process to fall within the accepted norm when

> the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.

*J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4ᵗʰ Cir. 2008).

Here, Plaintiff adopts 168 of the ALJ's 373 findings of fact. (ECF No. 44-1, at 3). She explicitly disputes 31 findings of fact as "not regularly made, and therefore, they are not entitled to a presumption of correctness." (ECF No. 44-1, at 3-5). For each of these 31 findings of fact, she provides a reason why she considers it to be inaccurate. Plaintiff provides no reason why she disputes the remaining 205 findings of fact. (ECF No. 44-1, at 5).

Plaintiff argues that the ALJ's hearing decision was not regularly made and should therefore not be given any deference. (ECF No. 44-1, at 8). The ALJ's findings of fact were not regularly made, she asserts, because he (1) permitted a 63-day hearing; (2) allowed Defendants to supplement the record throughout the hearing; (3) denied Plaintiff the opportunity to

provide rebuttal evidence; and (4) required Plaintiff to revise legal issues.  (ECF No. 44-1, at 8-10).

Defendants contend that Plaintiff included no citations to the administrative record and that Plaintiff did not show how any of the four irregularities prejudiced her.  (ECF No. 47-1, at 13).  In response to Plaintiff's first purported irregularity, Defendants point to *Reyes v. Bd. of Educ. for Prince George's Cnty. Pub. Sch.*, No. 20-cv-3565-PJM, 2022 WL 971082, at *8 (D.Md. Mar. 31, 2022), in which the parent asserted that the ALJ failed to "[c]ontrol defense counsel's objections; insist upon defense counsel's adherence to her evidentiary rulings [and] control defense counsel's supposed abusive cross examination of Plaintiff[.]"  In that case, Judge Messitte ruled "that none of the ALJ's rulings were outside the normal and accepted norms of the fact-finding process, and that Plaintiff suffered no prejudice other than to frequently lose her arguments in consequence on those rulings."  *Id.* at *9.

In response to Plaintiff's second purported irregularity, Defendants argue that "Plaintiff fails to identify (much less provide citation to) a single supplemental exhibit that was offered by the School Board at the administrative hearing or how the admission of any alleged supplemental exhibit caused her prejudice."  (ECF No. 47-1, at 14).  Defendants cite *Whitaker v. Bd. of Educ. for Prince George's Cty. Pub. Sch.*, No. 19-cv-2488-

GJH, 2020 U.S. Dist. LEXIS 154134, at *22 (D.Md. Aug. 25, 2020), in which Judge Hazel rejected the contention that the ALJ's decision was not regularly made when the ALJ "admitted into the record three pages of a document that was not disclosed at least five business days prior to the hearing pursuant to 34 C.F.R. § 300.512(a)(3)" because the plaintiff failed to "make any argument as to how these issues, individually or collectively, are legally significant or the manner in which they caused Plaintiff prejudice."

Regarding Plaintiff's third purported irregularity, Defendants argue that Plaintiff failed to cite to any examples in the administrative record where the ALJ denied her attempt to present rebuttal evidence and failed to explain how the denial prejudiced her. Defendants also assert that the admission of rebuttal evidence falls within the discretion of the ALJ. (ECF No. 47-1, at 15).

In response to Plaintiff's last purported irregularity, Defendants argue that Plaintiff failed to include a citation to the record showing that the ALJ's statement of the issues conflicted with those stated by Plaintiff, failed to explain how the alleged modification prejudiced her, and did not timely object to the ALJ's recitation of the issues during the hearing. (ECF No. 47-1, at 16).

Here, the ALJ's factual findings were regularly made. The ALJ conducted a proper hearing, allowed Plaintiff and Defendants to present evidence and make arguments, and resolved the factual questions in the normal way. *J.P.*, 516 F.3d at 259. The hearing was quite thorough, lasting 63 days.[7] The ALJ wrote a well-reasoned 178-page opinion supported by the record. *SE.H. v. Bd. of Educ. of Anne Arundel Cnty. Pub. Sch.*, 647 F.App'x 242, 248 (4th Cir. 2016). The opinion cited the witnesses' testimony and included the relevant legal standards, the ALJ's findings of fact, and legal conclusions. *J.P.*, 516 F.3d at 262; *Henrico Cnty.*, 399 F.3d at 305. Plaintiff fails to explain how holding a 63-day hearing, allowing Defendants to supplement the record, allegedly denying Plaintiff the opportunity to provide rebuttal evidence, or requiring Plaintiff to revise legal issues exceeded the scope of the ALJ's authority or discretion. *Reyes*, 2022 WL 971082, at *9. Plaintiff also fails to explain how these purported irregularities prejudiced her. *Whitaker*, 2020 U.S. Dist. LEXIS 154134, at *22. Because the proceedings were not "far from the accepted norm," the ALJ's findings of fact are entitled to a presumption of correctness. *J.P.*, 516 F.3d at 259.

---

[7] The hearing was conducted virtually in 2021 and technical difficulties at times prolonged the proceedings. Extensive discussion among counsel and the ALJ often delayed the taking of testimony. The ALJ exhibited patience and courtesy even when counsel did not.

**B. Provision of a Free Appropriate Public Education**

**1. Whether Defendants denied C.L.-W. a FAPE when they changed his placement from an in-person general education setting to a virtual-learning-at-home education setting without considering his individual needs, and without first convening an IEP meeting to allow Plaintiff an opportunity to meaningfully participate in the placement decision, during the period March 2020 to January 11, 2021**

The IDEA requires school districts to provide "[w]ritten prior notice to the parents of the child" whenever they "propose[] to initiate or change . . . the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child." 20 U.S.C. § 1415(b)(2)(B). Under 34 C.F.R. §§ 300.121 and 300.500, states must employ procedural safeguards to ensure that each public agency in the state meets the requirements of §§ 300.500 through 300.536. For example, parents must have an opportunity to "examine records" and "participate in meetings with respect to . . . [t]he identification, evaluation, and educational placement of students" and "[t]he provision of FAPE to the child." 34 C.F.R. § 300.501. The IDEA also provides that:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—
>
> **(I)** impeded the child's right to a free appropriate public education;
>
> **(II)** significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the

provision of a free appropriate public
education to the parents' child; or

**(III)** caused a deprivation of
educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). Thus, to succeed in her claim under
Issue 1, Plaintiff must prove both that a procedural violation
occurred and that it adversely affected C.L.-W.'s education.

Plaintiff contends that the ALJ erred in finding Defendants
did not procedurally violate the IDEA by "refus[ing] to allow
Plaintiff an opportunity to meaningfully participate and to
provide parental input" when they "reduced [C.L.-W.'s] special
education and related services[,] . . . "removed writing specially
designed instruction, removed most of his accommodations[,] and
made other substantive changes to [C.L.-W.'s] IEP without allowing
Plaintiff an opportunity to provide parental input and to
meaningfully participate in those decisions and substantive
changes to the IEP."  (ECF No. 44-1, at 15).  Plaintiff argues
that the change from in-person to virtual learning during the
COVID-19 pandemic effected a change in placement, and that she
never received a prior written notice when this "change of
placement was made and special education and related services for
the 11-12-19 IEP were eliminated or reduced as described in the
ICLP."  (ECF No. 44-1, at 11, 17).  In her opposition, Plaintiff
adds that C.L.-W. "missed a substantial amount of services as a

result of the unlawful change in placement which caused him harm and exacerbated his anxiety." (ECF No. 49-1, at 10).

Defendants respond that the ALJ correctly determined that the conversion to home instruction was not a change in placement. (ECF No. 47-1, at 20-21). They focus on the ALJ's "well-reasoned conclusion" informed by United States Department of Education ("USDOE") Guidance, Maryland State Department of Education ("MSDOE") Technical Assistance Bulletins, and *J.T. v. DeBlasio*, 500 F.Supp.3d 137 (S.D.N.Y. 2020), which addressed the issue of whether a change to virtual learning effected a change in placement. (ECF No. 47-1, at 21). They point out that Plaintiff ignored the effect of the COVID-19 pandemic on all students' learning. (ECF No. 47-1, at 19-20). They also emphasize that Plaintiff "takes issue with the substance of the ALJ's [f]act-[f]inding rather than the procedure that he utilized in reaching it and, in any event, fails to provide any record support for her factual assertions." (ECF No. 47-1, at 22).

The ALJ determined that "converting [C.L.-W.] from brick and mortar learning to virtual instruction at home was not a change in placement" because C.L.-W., "although at home, continued to receive the benefits of his IEP, as written, including education in the general education classroom, small group instruction, and individual instruction, to the maximum extent possible under the conditions caused by the COVID-19 pandemic." (ECF No. 1-1, at

35

120).  Thus, the ALJ concluded that "[b]ecause conversion to home instruction was not a change in placement, the procedural safeguards of the IDEA that require an IEP team to meet, invite the Parents to attend and to provide input, and provide the Parent with procedural safeguards prior to a change in placement do not apply."  (ECF No. 1-1, at 120).  "[E]ven if a procedural violation occurred," the ALJ determined, "[t]he Parent has not proven any harm as a result[.]"  (ECF No. 1-1, at 121).

In reaching this conclusion, the ALJ reviewed USDOE Guidance, MSDOE Technical Assistance Bulletins, and *J.T. v. DeBlasio*.  (ECF No. 1-1, at 62-68, 119-20).  The USDOE Guidance provided that "[o]nce school resumes, the [local education agency] must make every effort to provide special education and related services to the child in accordance with the child's individualized education program," but "[t]he Department understands there may be exceptional circumstances that could affect how a particular service is provided."  U.S. Dep't of Educ., Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak (Mar. 2020), https://perma.cc/R7JB-B9LZ.  The Guidance also instructed that "IEP teams may, but are not required to, include distance learning plans in a child's IEP that could be triggered and implemented during a selective closure due to a COVID-19 outbreak."  *Id.*

The MSDOE Bulletin provided that "during these exceptional times, a FAPE must be provided consistent with the need to protect the health and safety of students with disabilities and those individuals providing education services to these students," but "many disability-related modifications and services may be effectively provided through alternative delivery options, such as distance technology." Md. Dep't of Educ., Serving Children with Disabilities Under IDEA During School Closures Due to the COVID-19 Pandemic (Mar. 2020, revised Oct. 2020), https://perma.cc/8GKE-76S7. The Bulletin also stated that school districts need not "hold IEP team meetings for every student to determine how a FAPE will be provided during the time of extended school closure" and that "[i]f changes are made by agreement between the public agency and the parent, . . . formal written parental consent [is not] required." *Id.*

Finally, the ALJ relied on *J.T. v. DeBlasio*, which held that the plaintiffs "have not established that the pandemic-induced closure of the schools wrought a change in their pendency" because (1) "[i]t is impossible to square the USDOE's contemporaneous guidance with Plaintiffs' assertion that the City's switch to remote learning in light of the pandemic constituted a change in placement in and of itself"; and (2) the order closing schools "applied to the entire school system and . . . was of general applicability," and "Congress did not intend for the IDEA

to apply to system wide administrative decisions." *J.T.*, 500
F.Supp.3d at 187, 188, 189.  These authorities led the ALJ to
conclude that the switch to virtual learning did not effect a
change in placement, and therefore no procedural violation
occurred.  (ECF No. 1-1, at 120).

The ALJ did not err in finding Defendants did not violate the
IDEA by changing C.L.-W.'s placement without allowing Plaintiff to
participate meaningfully.  Even if C.L.-W.'s ICLP provided for
fewer goals, accommodations, and hours of special education
services than specified in his IEP, the USDOE Guidance acknowledged
that "exceptional circumstances" could necessitate a school
district not providing services in full accordance with a child's
IEP despite "every effort."  U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS
ON PROVIDING SERVICES TO CHILDREN WITH DISABILITIES DURING THE CORONAVIRUS DISEASE
2019 OUTBREAK (Mar. 2020), https://perma.cc/R7JB-B9LZ.  Plaintiff
does not argue that the COVID-19 pandemic did not present
exceptional circumstances, or that Defendants did not make every
effort to comply with C.L.-W.'s IEP.  More importantly, federal
and state agencies explicitly instructed that the change to virtual
instruction necessitated by the COVID-19 pandemic did not effect
a change in placement, and that school districts did not need to
hold an IEP team meeting to discuss how to provide a FAPE during
the period of virtual instruction.  Plaintiff has not shown that
Defendants changed C.L.-W.'s placement; thus, Defendants had no

obligation to hold an IEP team meeting or provide Plaintiff an opportunity to participate in their decision to shift to remote learning. Accordingly, no procedural error occurred.

Even if a procedural violation did occur, however, Plaintiff has not shown that it impeded C.L.-W.'s right to a FAPE, significantly impeded Plaintiff's opportunity to participate in the decision-making process regarding the provision of a FAPE, or caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Although C.L.-W.'s grades did not improve from fifth to sixth grade, (ECF No. 42-57, at 176), he did progress on his IEP goals during the period of remote learning. Indeed, he made sufficient progress on his IEP goals during eight of ten measurable progress reports throughout his sixth-grade year. (ECF No. 42-66, at 105-06). His consistent progress toward his IEP goals shows that C.L.-W. received at least some educational benefit during the period of remote learning. *Endrew F.*, 580 U.S. at 399; *see also Rowley*, 458 U.S. at 207, n.28 ("[T]he achievement of passing marks and advancement from grade to grade will be *one* important factor in determining educational benefit.") (emphasis added).

Additionally, in both fall 2019 and fall 2020, C.L.-W.'s standardized test scores reflected that he was performing at a third-grade level in Reading Comprehension, Math Calculation, and Written Language Expression. (ECF Nos. 42-57, at 95-96, 124-25;

39

42-60, at 112-13, 185-86).  Although C.L.-W.'s test scores did not improve during the period of remote learning, his fall 2019 IEP—before the pandemic—noted that "he is doing worse than he was when he was in the third grade."  (ECF Nos. 42-57, at 98; 42-60, at 115).  Thus, C.L.-W.'s stagnation in progress started *before* the conversion to remote learning.  Progress is also not required to deliver a FAPE.  *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 327 (4th Cir. 2009) ("[P]rogress, or the lack thereof, while important, is not dispositive."); *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360-61 (4th Cir. 2009) (finding no denial of a FAPE when some evidence showed regression and some showed progress).

Plaintiff has not shown that the change to remote learning was responsible for C.L.-W.'s lack of progress.  The closest she came to showing harm to C.L.-W.'s education is when she testified that C.L.-W. suffered academically during remote learning because he experienced technical difficulties getting into the virtual classroom sessions.  (ECF No. 43-4, at 18).  One of C.L.-W.'s teachers, however, testified that C.L.-W. knew how to use the computer Defendants provided.  (ECF No. 43-55, at 10-11).  Because C.L.-W. made progress toward his IEP goals during remote learning and his standardized test score stagnation started *before* the pandemic, Plaintiff has not met her burden to prove Defendants denied C.L.-W. a FAPE by implementing a change to remote learning.

40

Plaintiff also has not shown that Defendants impeded her opportunity to participate in the decision-making process when Defendants instituted the ICLP.  To the contrary, the record shows that Ms. Chalkley-Legette called Plaintiff to discuss a shift to remote learning, emailed a copy of the ICLP, and attached a copy of the ICLP to the class's communication portal.  (ECF Nos. 42-60, at 146; 43-53, at 20-22).  Ms. Chalkley-Legette testified that when she talked to Plaintiff about the ICLP, Plaintiff did not object to converting C.L.-W. to remote learning.  (ECF Nos. 42-60, at 146; 43-56, at 33, 35).  The ALJ found Ms. Chalkley-Legette's testimony more credible than that of Plaintiff.  (ECF No. 1-1, at 162, 164).  Because a reviewing court cannot "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility," this court will defer to the ALJ's determination that Ms. Chalkley-Legette credibly testified that Plaintiff did not object to the shift to remote learning.  *Doyle,* 953 F.2d at 104 (quoting *McCrary*, 515 F.2d at 1086).  Accordingly, Plaintiff has not shown that Defendants procedurally or substantively erred in switching to virtual instruction without holding an IEP team meeting.

**2. Whether Defendants denied C.L.-W. a FAPE and violated the Child Find provisions of the IDEA when they failed to consider C.L.-W.'s need for special education and related services after receiving private occupational therapy, psychological, and educational evaluations in August 2020**

The IDEA requires school districts to assess children "in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(B).  34 C.F.R. § 300.111, commonly referred to as "Child Find," provides that states "must have in effect policies and procedures to ensure that . . . [a]ll children with disabilities . . . are identified, located, and evaluated."  When evaluating a child, school districts must

> [u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining—
>
> (i) Whether the child is a child with a disability under § 300.8; and
>
> (ii) The content of the child's IEP[.]

34 C.F.R. § 300.304(b).  School districts must ensure that "the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  34 C.F.R. § 300.304(c)(6).

Additionally, the IEP team must "[r]eview existing evaluation data on the child, including . . . [e]valuations and information provided by the parents of the child[.]" 34 C.F.R. § 300.305(a)(1).

42

If a parent shares with the school district an IEE obtained at their own private expense, "the results of the evaluation . . . [m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child."  34 C.F.R. § 300.502(c).

Plaintiff asserts that she "provided the Defendant[s], through [their] guidance counselor, with private speech-language, psychological, educational, and occupational therapy evaluations" as well as medical records describing C.L.-W.'s anxiety diagnosis, but that Defendants did not consider them in the October 29, 2020 IEP meeting.  (ECF No. 44-1, at 25, 26, 27).  Defendants respond that Plaintiff is requesting that this court "not consider[] the ALJ's conclusions at all . . . and scour[] the record in search of support for the factual assertions she casually makes without any citation."  (ECF No. 47-1, at 23).  Instead, Defendants argue, this court must "conduct a bounded review of the administrative record and decide the case based upon the evidence in the administrative record after presuming the administrative fact-findings to be correct."  (ECF No. 47-1, at 23).

The ALJ determined that "there is no evidence of denial of a FAPE based on the failure of [Defendants] to consider either Dr[.] Patton's or Ms. Neway's report."  (ECF No. 1-1, at 126).  He found that Plaintiff "presented no evidence that the failure to consider Ms. Neway's report at the October 29, 2020[] IEP team meeting

43

resulted in any educational deficit or impeded [C.L.-W.'s] learning." (ECF No. 1-1, at 126). He also found "insufficient evidence . . . to conclude that the October 29, 2020 IEP team was on notice of a likely disability, even if it had Dr. Patton's July 19, 2020[] report at the October 29, 2020 IEP team meeting." (ECF No. 1-1, at 126).

The court finds that Defendants procedurally violated the IDEA by failing to consider the reports. In *School Board of the City of Norfolk v. Brown*, 769 F.Supp.2d 928 (E.D.Va. 2010), the court found procedural error when a school district "failed to consider relevant information, including a report based on a psychiatric evaluation of [the child] which was conducted following the behavior which led to his suspension." *Norfolk*, 769, at 946, 947. Here, similarly, the record reflects that Plaintiff emailed Dr. Neway's occupational therapy report and Dr. Patton's assessment of C.L.-W.'s intellectual functioning to C.L.-W.'s guidance counselor, Ms. Smith, (ECF No. 42-57, at 241, 244), and that Defendants did not consider them at the October 29, 2020 IEP team meeting, (ECF No. 42-57, at 127). The ALJ makes much of the facts that Plaintiff emailed the reports to C.L.-W.'s guidance counselor instead of a member of his IEP team, did not ask the guidance counselor to forward them to his IEP team, and did not mention them at C.L.-W.'s next IEP team meeting. (ECF Nos. 1-1, at 125-26; 42-57, at 127, 241, 244). This court, however, finds

that by sending the reports to C.L.-W.'s guidance counselor, Plaintiff provided them to Defendants.  It was reasonable for Plaintiff to assume the guidance counselor would pass along the reports to C.L.-W.'s IEP team, given that even a well-informed parent may not understand the intricacies of who reported to whom at Drew Freeman, and who exactly amongst C.L.-W.'s many educators belonged to his IEP team.   Likewise, a parent with little experience in school administration may reasonably feel uncomfortable introducing topics of conversation at their child's IEP team meeting, especially when the parent herself has special needs, and especially when the topic is potentially sensitive. Indeed, Plaintiff procured the IEEs precisely because she was unhappy with the IEP team's actions.  The onus was on Defendants to maintain and enforce a policy requiring staff to share IEEs with a child's IEP team upon receipt, not on Plaintiff to know exactly to whom to direct the reports.  Plaintiff has shown that Defendants procedurally violated the IDEA by failing to "[r]eview existing evaluation data on the child, including . . . [e]valuations and information provided by the parents of the child."  34 C.F.R. § 300.305.

To establish a denial of a FAPE, however, Plaintiff must also show substantive harm.  After a careful review of the record, the court concludes that Plaintiff failed to meet that burden.  She presented no evidence that Defendants' failure to consider the

evaluations resulted in any educational deficit to C.L.-W.  Thus, the ALJ did not err in finding that Defendants did not deny C.L.-W. a FAPE when they failed to review the private evaluations Plaintiff furnished.

### 3. Whether Defendants denied C.L.-W. a FAPE by failing to fully implement his IEP for the period March 2020 to January 11, 2021

"[T]he failure to perfectly execute an IEP does not necessarily amount to the denial of a free, appropriate public education." *Sumter Cnty.*, 642 F.3d at 484.  A material failure to implement an IEP or a failure to implement a material portion of an IEP, however, violates the IDEA.  *Id.*  The Fourth Circuit has held that a school district's failure to provide the hours of therapy required by an IEP constituted a material failure to implement the IEP.  *Id.* at 486.  In this district, Judge Davis has also found a material failure to implement the IEP when the school district failed to provide an aide during all classroom activities as specified in the IEP.  *Manalansan v. Bd. of Educ. of Baltimore City*, No. 01-cv-312-AMD, 2001 WL 939699, at *11-12 (D.Md. Aug. 14, 2001).  On the other hand, courts in this district have found no material failure when the school district (1) provided a general education classroom with paraeducator support instead of pull-out math instruction as specified in the IEP; (2) moved the child into a smaller class comprised of special education students; and (3) provided a child with more hours of special education than required

by the IEP. *Plotkin v. Montgomery Cnty. Pub. Sch.*, No. 17-cv-0571-TDC, 2022 WL 4280170, at *10 (D.Md. Sept. 15, 2022), *aff'd*, No. 22-2073, 2023 WL 7272102 (4ᵗʰ Cir. Nov. 3, 2023); *Reyes*, 2022 WL 971082, at *20; *R.F. v. Cecil Cnty. Pub. Sch.*, No. 17-cv-2203-ADC, 2018 WL 3079700, at *10 (D.Md. June 21, 2018), *aff'd sub nom. R.F. ex rel. E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237 (4ᵗʰ Cir. 2019).

Plaintiff contends that Defendants "failed to materially implement Student's IEP from March 13, 2020, through January 2021." (ECF No. 44-1, at 11). She argues that "[b]etween March 13, 2020[] through April 13, 2020, the Defendant[s] did not implement Student's IEP" at all because it did not provide any instruction to any student, and that "[b]etween March 13, 2020, through June 8, 2020," Defendants provided only about "320 minutes out of the 22,200 minutes of instruction [C.L.-W.] was entitled to receive." (ECF No. 44-1, at 11). Plaintiff asserts that C.L.-W.'s ICLP omitted the majority of the accommodations, goals, and objectives enumerated in his IEP, which "reduced [C.L.-W.'s] specially designed instruction from seven hours per week to 40 minutes per week" and his "speech language services from 30 minutes per week of direct speech learning services to only a consultation of 30 minutes per month with no direct speech language services." (ECF No. 44-1, at 12-13). During C.L.-W.'s next school year, Plaintiffs argue that Defendants did not materially implement the new October

29, 2020 IEP because C.L.-W. "was still in a home-based virtual environment." (ECF No. 44-1, at 13).  In her opposition, Plaintiff adds that the ICLP also omitted text-to-speech services, which the November 12, 2019 IEP required.  (ECF No. 49-1, at 15-16). Defendants respond that the ALJ correctly found that Defendants "implemented as fully as possible the November 12, 2019 and the October 29, 2020 IEPs" given the constraints of the COVID-19 pandemic.  (ECF No. 47-1, at 25-27).

The ALJ determined that the April 2, 2020 ICLP "in operation complemented, and did not replace, the November 12, 2019 IEP." (ECF No. 1-1, at 132).  The ALJ relied on testimony from C.L.-W.'s special education case manager, who attested that she crafted the ICLP to focus on C.L.-W.'s "main goals or the areas that we needed to continue to work on to provide him the most support" based on guidance from Defendants, (ECF No. 43-53, at 20; ECF No. 1-1, at 128), who had "conference[d] with MSDE about how to provide education to learning-disabled students during the pandemic[,]" (ECF No. 1-1, at 128).  She was asked whether "the ICLP was reasonably calculated to provide him with maximum benefit under the constraints imposed by COVID 19 and school closures at the time?" (ECF No. 43-53, at 20).  She testified that the "ICLP was the appropriate measure that we had to support [C.L.-W.] at that time because we were on virtual learning."  (ECF 43-53, at 20). The ALJ found that the ICLP reduced C.L.-W.'s speech language

48

services to only a consultation because C.L.-W. "made sufficient progress in figurative speech during [his] virtual sessions." (ECF No. 1-1, at 130). The ALJ maintained that proving Defendants failed to implement the November 12, 2019 IEP "requires more than counting the number of modifications, accommodations, services and related services in the IEP and comparing them to the number[s] . . . in the ICLP" and "more than Dr. Livelli's unsupported opinion that [C.L.-W.] did not receive all of the services in the November 12, 2019 IEP." (ECF No. 1-1, at 130-31). The ALJ found Dr. Livelli's expert testimony unconvincing because his opinions "fail[ed] to include a discussion with any educator, an observation of [C.L.-W.] in class in a brick and mortar building, or an observation of [C.L.-W.] in a virtual learning classroom." (ECF No. 1-1, at 131). Based on the Supreme Court's instruction that courts defer to educators and USDOE Guidance explaining that "schools may not be able to provide all special education and related services in the same manner as typically provided," the ALJ determined that Defendants implemented C.L.-W.'s IEPs "to the maximum extent possible given the restraints of the COVID 19 pandemic." (ECF No. 1-1, at 132).

This court is not aware of any case in this district specifically addressing whether a school district's failure to adhere to all requirements enumerated in a student's IEP during the shift to virtual learning necessitated by the COVID-19 pandemic

49

effected a violation of the IDEA.  A number of other districts that have addressed the issue have found a denial of a FAPE when the school district failed to comply substantially with the child's IEP during remote instruction.  *See, e.g.*, *E.E. ex rel. Hutchinson-Escobedo v. Norris Sch. Dist.*, No. 1:20-cv-1291-AWI-CDB, 2023 WL 3124618, at *13-14 (E.D.Cal. Apr. 27, 2023) (finding denial of a FAPE because the school district "did not provide sufficient virtual instruction" during the pandemic); *T.H. ex rel. T.B. v. DeKalb Cnty. Sch. Dist.*, 564 F.Supp.3d 1349, 1359 (N.D.Ga. 2021) (finding denial of a FAPE when the school district "only scheduled a student for half of the instruction required by his IEP and the student subsequently fail[ed] to earn a single credit toward graduation"); *Charles H. v. D.C.*, No. 1:21-cv-00997-CJN, 2021 WL 2946127, at *9 (D.D.C. June 16, 2021) (ordering the school district to comply with students' IEPs when the "students are receiving (at most) less than half of the specialized education hours required by their IEPs").

Other courts, however, found no denial of FAPE during the period of remote learning.  *See L.J.B. v. N. Rockland Cent. Sch. Dist.*, 660 F.Supp.3d 235, 262, 263 (S.D.N.Y. 2023) (finding no denial of a FAPE when a school district's failure to allow a child to bring his assistive technology device home was only a *de minimis* departure from his IEP because "despite not having access to a device at home consistently, [the child] still progressed");

*C.P.C. ex rel. Caldara v. Boulder Valley Sch. Dist. RE-2*, No. 22-cv-00564-RMR-SBP, 2023 WL 8831330, at *4 (D.Colo. Dec. 21, 2023) (finding no denial of a FAPE when the plaintiff made only a conclusory statement that his child "did not receive the service minutes that his needs and IEP required," while the record "provides ample evidence supporting the District's position that [the child] was provided the appropriate services"); *M.B. v. Fairfax Cnty. Sch. Bd.*, 660 F.Supp.3d 508, 526 (E.D.Va. 2023) (finding no denial of FAPE when a school district "developed Temporary Learning Plans for students . . . to promote voluntary participation in virtual learning activities while schools were closed" and "offered recovery services to [the student] to address learning loss from the pandemic, including 21 weeks of recovery services for [his] math goals").

Under the circumstances here, the adjustments adopted during the pandemic did not result in a denial of a FAPE.  Plaintiff is correct that the April 2, 2020 ICLP required fewer minutes of special education services per week and included fewer goals than did the November 12, 2019 IEP.  C.L.-W.'s November 12, 2019 IEP required two hours per week of special education instruction outside the general classroom, (ECF No. 42-57, at 113), while the April 2, 2020 ICLP required only forty minutes per week, (ECF No. 42-60, at 150).  The November 12, 2019 IEP required one hour and 30 minutes per week of speech/language therapy, (ECF No. 42-

57, at 113-14), while the April 2, 2020 ICLP required only consultations, not therapy, for 30 minutes per month. (ECF No. 42-60, at 153). The IEP included goals in Reading Comprehension, Math Calculation, Written Language Expression, and Speech and Expressive Language, (ECF No. 42-57, at 110-12), while the ICLP included only Reading Comprehension and Math Calculation goals, (ECF No. 42-60, at 151). Ms. Howell, special education coordinator at Drew Freeman which C.L.-W. attended the following year, testified, based solely on ICLP, that one might conclude that C.L.-W. did not receive 48 hours of special education services to which his IEP entitled him between April 14, 2020 and June 8, 2020 at SES. (ECF No. 43-18, at 35-36). She, however, was not at SES and could not discern precisely what services during which hours were provided. She also reiterated that the ICLP "provided an outline for how support would be provided . . . when the entire state had to shift to distance learning." (ECF No. 43-26, at 7).

The ALJ reasonably concluded that "counting the number of modifications, accommodations, services and related services in the IEP and comparing them to the number[s] . . . in the ICLP" is insufficient to show a denial of a FAPE. (ECF No. 1-1, at 130-31). Plaintiff did not show that Defendants had the ability to deliver all the modifications, accommodations, services, and related services in C.L.-W.'s IEP between April 14, 2020 and June 8, 2020, but failed to do so. In fact, Ms. Chalkley-Legette

testified that the goals and hours of services outlined in the
ICLP represented the most appropriate measures Defendants could
provide at the time given the constraints of virtual learning.
(ECF 43-53, at 20).  Ms. Chalkley-Legette also testified that when
C.L.-W. attended his classes between April 14, 2020 and June 8,
2020, he received the accommodations and supports to which his IEP
entitled him.  (ECF No. 43-53, at 29-30, 32).  Unlike in *Sumter
County*, even if there was a discrepancy between the hours of
services specified in C.L.-W.'s IEP and the hours actually
delivered between March 13, 2020 to June 2020, this discrepancy is
not substantial enough to represent a material failure to implement
the IEP.  *Sumter Cnty.*, 642 F.3d at 486.

Plaintiff also has not proven that Defendants failed to
implement C.L.-W.'s IEP during the following school year, 2020-
2021.  Although Dr. Livelli testified that Defendants denied C.L.-
W. a FAPE in the 2020-2021 school year, (ECF No. 43-1, at 38),
Plaintiff has not shown how many hours of services C.L.-W. received
during the 2020-2021 school year.

Additionally, Plaintiff has not proven that Defendants failed
to implement the text-to-speech services during both the March 13,
2020-June 2020 period and the 2020-2021 school year.  To the
contrary, one of C.L.-W.'s teachers testified that she ensured
C.L.-W. knew how to use the school software's text-to-speech
feature and orally provided text-to-speech services during the

period of remote learning.  (ECF No. 43-55, at 22-24; *see also* ECF No. 43-24, at 35).

Finally, Plaintiff has not proven that Defendants' failure to provide C.L.-W. with speech/language therapy services constituted a failure to implement the IEP.  Ms. Marcella Coleman, M.S., a speech and language pathologist contractor who works for Defendants, testified that C.L.-W. made such marked progress during his speech and language therapy sessions with her and with Ms. Yvonne Moulton, another speech and language pathologist, that she recommended a decrease in services from therapy to solely consults.  (ECF No. 43-52, at 10-12).  Indeed, C.L.-W.'s progress was so strong that he achieved his speech and language expressive language IEP goal by November 5, 2020.  (ECF No. 42-66, at 104).  His progress led the IEP team to remove the speech and language goal in the October 29, 2020 IEP.  (ECF Nos. 42-57, at 141-42; 43-52, at 20).  Even if Defendants stopped providing speech services before October 29, 2020, Plaintiff has not shown that Defendants' failure to provide the services caused a denial of FAPE.  Quite the opposite—C.L.-W. made consistent progress toward his speech and language goal and ultimately achieved it.

Given that the USDOE Guidance and MSDOE Bulletins acknowledged that school districts may not be able to deliver services in full accordance with a child's IEP despite "every effort" during the period of remote instruction necessitated by

the COVID-19 pandemic, the ALJ did not err in finding that
Defendants implemented C.L.-W.'s IEP as fully as possible from
March 13 to June 2020.   U.S. Dep't of Educ., Questions and Answers on
Providing Services to Children with Disabilities During the Coronavirus Disease
2019 Outbreak (Mar. 2020), https://perma.cc/R7JB-B9LZ; Md. Dep't of
Educ., Serving Children with Disabilities Under IDEA During School Closures Due
to the COVID-19 Pandemic (Mar. 2020, revised Oct. 2020),
https://perma.cc/8GKE-76S7.   Plaintiff has failed to show that
the adjustments Defendants made to C.L.-W.'s IEP during the period
of remote instruction denied him a FAPE.

### 4. Whether Defendants denied C.L.-W. a FAPE by failing to develop an appropriate IEP for the period January 11, 2019 through January 11, 2021

"To ensure delivery of a FAPE, the IDEA requires a school
district to provide an appropriate IEP for each child determined
to have a disability requiring special education and related
services." *E.H. v. McKnight*, No. 21-cv-2297-TDC, 2022 WL 3908630,
at *15 (D.Md. Aug. 30, 2022) (citing 20 U.S.C. §§ 1401(3)(A),
1414(d)(1)(A)).  "To meet its substantive obligation under the
IDEA, a school must offer an IEP reasonably calculated to enable
a child to make progress appropriate in light of the child's
circumstances." *Endrew F.*, 580 U.S. at 399.   "[I]f the child is
being educated in the regular classrooms of the public education
system, [the IEP] should be reasonably calculated to enable the
child to achieve passing marks and advance from grade to grade."

55

*Rowley*, 458 U.S. at 204.  "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399.  The "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent." *A.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004).  "As long as an individualized education program provides the basic floor of opportunity for a special needs child, a court should not attempt to resolve disagreements over methodology." *E.L.*, 773 F.3d at 517.

Plaintiff argues that Defendants failed to develop appropriate IEPs for C.L.-W. between March 2020 and January 11, 2021 because "his IEPs were never revised to address attendance and school avoidance behavior concerns." (ECF No. 44-1, at 28, 29). Specifically, she maintains that despite notice of C.L.-W.'s poor grades, poor academic performance, anxiety, attendance issues, and school refusal, Defendants "still failed to conduct a[] [functional behavioral assessment] of [C.L.-W.] to obtain necessary information about [his] behaviors so they could be addressed adequately," (ECF No. 44-1, at 31), either via his "IEPs or a behavioral intervention plan," (ECF No. 1-1, at 30). Defendants' failure to conduct a functional behavioral assessment ("FBA"), Plaintiff contends, "rose to the level of the denial of a FAPE" and "resulted in the loss of an educational opportunity

56

for" C.L.-W.   (ECF No. 44-1, at 31).   Plaintiff cites out-of-circuit authority holding that "a student may be denied a FAPE if his educational plan does not contain sufficient interventions to adequately address attendance issues."   (ECF No. 44-1, at 28) (citing *Middleton v. D.C.*, 312 F.Supp.3d 113, 146 (D.D.C. 2018)).

Defendants respond that the ALJ's analysis regarding the appropriateness of C.L.-W.'s IEPs was "based upon a cogent application of the law to the relevant facts, which he reviews exhaustively, to reach a well-reasoned conclusion."   (ECF No. 47-1, at 28).   They also point out that Plaintiff did not include any citations from the administrative record to support her contention that Defendants failed to develop appropriate IEPs.   (ECF No. 47-1, at 29).

The ALJ found that the October 29, 2020 IEP team did consider Parent's concerns about C.L.-W.'s anxiety and "added measures to the IEP for use by teachers that included teacher tone and an opportunity for [C.L.-W.] to signal a teacher privately if [he] needed a break because he was anxious."   (ECF No. 1-1, at 136). The ALJ evaluated C.L.-W.'s academic progress, determining that C.L.-W. made progress in meeting his goals in reading, writing, and math in sixth grade.   (ECF No. 1-1, at 150-51).   The ALJ found that when C.L.-W. performed at a third-grade level reading level in fourth, fifth, and sixth grades, his IEP teams modified his instruction and added accommodations.   (ECF No. 1-1, at 152-53).

The ALJ found that C.L.-W. was not entitled to extended school year ("ESY") services as Plaintiff "presented no evidence that [C.L.-W.'s] gains during the regular school year would be significantly jeopardized because [Defendants] did not provide ESY." (ECF No. 1-1, at 155). In sum, the ALJ concluded that "each IEP was reasonably calculated to provide educational benefit and calculated to make appropriate progress based upon [C.L.-W.'s] unique circumstances," and that C.L.-W. "did make educational progress under these IEPs." (ECF No. 1-1, at 157).

Plaintiff's sole contention here is that Defendants failed to develop an appropriate IEP because they did not conduct an FBA; thus, the court only considers whether Defendants' failure to conduct an FBA constituted a denial of a FAPE.[8] The IDEA mandates that if a child's "behavior impedes the child's learning or that of others," the IEP team must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior" when developing the IEP. 20 U.S.C. § 1414; 34 C.F.R. § 300.324. "A failure to conduct an FBA will not always rise to the level of a denial of FAPE, but 'when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors.'" *S.S. v. Bd. of Educ. of Harford Cnty.*, 498 F.Supp.3d 761, 780 (D.Md. 2020)

---

[8] Plaintiff advances the same argument here as under Issue 5, so the court will address both issues here.

(quoting *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 190 (2<sup>d</sup> Cir. 2012). An FBA is in order when the child's problem behavior "interfere[s] with [his or] her ability to achieve satisfactory growth and progress on [his or] her IEP goals and objectives." *Id.* at 771.

The ALJ cited two opinions supporting the proposition that school districts cannot be required to address behaviors ostensibly analogous to absenteeism. In one, the court determined that although "drug use may impede any student's ability to take advantage of the educational opportunities," drug prevention is not a type of "supportive service" contemplated under the IDEA. *Armstrong ex rel. Steffensen v. Alicante Sch.*, 44 F.Supp.2d 1087, 1089 (E.D.Cal. 1999). In the other, the court found:

> That students are engaging in sexual conduct outside school, or are less interested in school because they are distracted by intimate relationships, is largely beyond the scope of this statute. The IDEA does not require schools to remove every impediment to learning of any kind and from any cause. If a student is stealing cars, the IDEA would not require the District to post bail and hire a lawyer to represent him, even if a prison term would interfere with his education and stealing cars allegedly is a symptom of his disability.

*Ashland Sch. Dist. v. Parents of Student R.J.*, 585 F.Supp.2d 1208, 1231 (D.Or. 2008), *aff'd*, 588 F.3d 1004 (9th Cir. 2009). Attendance issues, however, fall more closely under the ambit of the IDEA than do drug use or preoccupation with intimate

relationships.  Courts have found IEPs inadequate when they "failed
to address in some fashion [the child's] persistent absence and
tardiness," as long as the "absence was linked to [the child's]
disability." *Lamoine Sch. Comm. v. Ms. Z. ex rel. N.S.*, 353
F.Supp.2d 18, 33, 34 (D.Me. 2005); *see also Middleton*, 312
F.Supp.3d at 146 ("[A] student may be denied a FAPE if his
educational plan does not contain sufficient interventions to
adequately address attendance issues.").

Here, C.L.-W.'s IEPs did not sufficiently address his
attendance issues.  Although several of his educators testified
that C.L.-W.'s attendance issues negatively affected his
education, (ECF Nos. 43-18, at 4; 43-41, at 9-10, 11, 27-28; 43-
53, at 14, 15, 25-26, 29, 33; 43-55, at 9-10, 14-15), and his
October 29, 2020 IEP acknowledged Plaintiff's input that C.L.-W.'s
anxiety affected his attendance, (ECF No. 42-57, at 127), his IEPs
and ICLP did not include any measure to address C.L.-W.'s
attendance issues.  (ECF Nos. 42-57, at 91-118, 120-48; 42-60, at
150-53).

To prove that Defendants procedurally violated the IDEA by
failing to conduct an FBA, however, Plaintiff must also show a
causal connection between the problem behavior—C.L.-W.'s
attendance issues—and his disability. *Springer v. Fairfax Cnty.
Sch. Bd.*, 134 F.3d 659, 666 (4th Cir. 1998); *see also Sch. Bd. of
the City of Suffolk v. Rose*, 133 F.Supp.3d 803, 822-23 (E.D.Va.

2015).  Plaintiff argues that the disability that caused C.L.-W.'s attendance issues is anxiety.  (ECF No. 44-1, at 31, 32).  The ALJ found Plaintiff's testimony that C.L.-W. suffered from anxiety in school unconvincing because (1) C.L.-W.'s educators testified that they never saw C.L.-W. exhibit signs of anxiety; (2) none of the private evaluations Plaintiff obtained suggested C.L.-W. had anxiety during testing; and (3) Plaintiff never observed C.L.-W. in the classroom besides peering through a closed door.  (ECF No. 1-1, at 160-63).  As the ALJ noted, Plaintiff does not allege in the complaint that Defendants failed to evaluate C.L.-W. in the special education eligibility category of serious emotional disturbance when they became aware that C.L.-W. had anxiety, nor does she argue it in her motion for summary judgment.  (ECF No. 1-1, at 166).  Plaintiff does assert in the complaint that C.L.-W. "suffered with significant attendance and school avoidance issues but his IEPs were never revised to address attendance and school avoidance behavior concerns.  No FBA was completed and [behavior intervention plan] implemented with positive attendance behavior interventions, supports and other strategies to help" him.  (ECF No. 1 ¶ 81).

An FBA is "the systematic process of gathering information to guide the development of an effective and efficient behavior intervention plan for the problem behavior."  Md. Code Regs. 13A.08.04.02(B)(5)(a).  A behavior intervention plan ("BIP") is a

"proactive, data-based, structured plan that is developed as a result of a functional behavioral assessment which is consistently applied by trained staff to reduce or eliminate a student's challenging behaviors and to support the development of appropriate behaviors and responses." Md. Code Regs. 13A.08.04.02(B)(1). Thus, an FBA is an assessment that leads to the creation of a BIP.

To receive a BIP, the child must suffer from a qualifying disability. The qualifying disabilities include:

> an intellectual disability, a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this part as "emotional disturbance"), an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.

34 C.F.R. § 300.8(a)(1). "Emotional disturbance" is defined as:

> (i) Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.

34 C.F.R. § 300.8(c)(4). A child suffering from a serious emotional disturbance is entitled to a BIP if the child's parent shows a causal connection between one of the five symptoms of emotional disturbance and the child's educational difficulties. *Springer*, 134 F.3d at 666; *see also Suffolk*, 133 F.Supp.3d at 822-23.

The ALJ correctly found that Plaintiff failed to establish a causal connection between C.L.-W.'s attendance issues and his anxiety. (ECF No. 1-1, at 167). Plaintiff does not explain which of the five symptoms of emotional disturbance that C.L.-W. experiences. Without identifying which symptom applies, Plaintiff does not even begin to demonstrate a causal connection between C.L.-W.'s attendance issues and his anxiety. The Fourth Circuit has noted that "[a]ny definition that equated simple bad behavior with serious emotional disturbance would exponentially enlarge the

burden IDEA places on state and local education authorities.  Among
other things, such a definition would require the schools to
dispense criminal justice rather than special education."
*Springer*, 134 F.3d at 664.  In the cases finding that the school
district denied a FAPE by failing adequately to address attendance
issues, the plaintiff had shown a link between the attendance
issues and the child's disability.  *Lamoine*, 353 F.Supp.2d at 33,
34; *Middleton*, 312 F.Supp.3d at 146-47.  Absent that showing, the
IDEA does not mandate holding a school district responsible for
making sure a child arrives to school on time.  The mere fact that
C.L.-W. was frequently absent and tardy did not put Defendants on
notice that he might be suffering from a serious emotional
disturbance.  *See Tracy v. Beaufort Cnty. Bd of Ed.*, 335 F.Supp.2d
675, 689 (D.S.C. 2004).  Thus, the IDEA did not require Defendants
to implement a BIP to address C.L.-W.'s attendance issues.

Furthermore, the October 29, 2020 IEP adequately addressed
what Plaintiff describes as the root of C.L.-W.'s attendance
issues—his anxiety.  It instructed teachers to use a "gentle" tone
when redirecting and provided an opportunity for C.L.-W. to signal
a teacher privately if he needed to take a break due to his anxiety.
(ECF No. 42-57, at 127, 136).  In *R.F. v. Cecil County Public
Schools*, Judge Copperthite affirmed the ALJ's statement that
"[t]he law does not require a public school system to write a[n]
FBA or a BIP every time a new interfering behavior is observed."

*R.F.*, 2018 WL 3079700, at *14.  When Plaintiff expressed concern about C.L.-W.'s anxiety, the IEP team considered her concern and adjusted the IEP accordingly.  (ECF Nos. 42-57, at 127, 136; 43-29, at 34).  Because the IEP team took sufficient measures to address C.L.-W.'s anxiety, the IDEA did not require them to conduct an FBA, especially when several of C.L.-W.'s educators testified that they did not see signs of anxiety in the classroom and that C.L.-W. and Plaintiff never told them C.L.-W. suffered from anxiety.  (ECF Nos. 43-40, at 29; 43-46, at 6; 43-53, at 18; 43-55, at 10).  Additionally, an IEP need not completely cure the problem behavior to be appropriate.  *Cf. M.S.*, 553 F.3d at 327 ("[P]rogress, or the lack thereof, while important, is not dispositive.").  Thus, Plaintiff has not shown that Defendants procedurally violated the IDEA by failing to conduct an FBA or implement a BIP to address C.L.-W.'s attendance issues.

Even if a procedural error occurred, Plaintiff has not shown that the failure to conduct an FBA or implement a BIP caused detriment to C.L.-W.'s education.  Dr. Patton testified that C.L.-W.'s attendance issues "may be possibly associated with [his] anxiety," and thus an FBA "is something that would be necessary." (ECF No. 43-16, at 52).  He did not, however, testify that Defendants' failure to conduct an FBA or implement a BIP, specifically, caused educational harm.  (ECF Nos. 43-16, at 38, 52; 43-24, at 57; 43-25, at 40).  Thus, Plaintiff has not met her

burden of showing that Defendants denied C.L.-W. a FAPE under Issue 4.

**5. Whether Defendants denied C.L.-W. a FAPE by failing to address or provide supports relating to his behavioral issues from January 11, 2019 through January 11, 2021**

Here, Plaintiff advances the same argument as she did under Issue 4—that Defendants "did not consider the use of positive behavioral interventions, supports[,] and other strategies to address [C.L.-W.'s] anxiety-related behaviors (e.g., attendance and school refusal concerns) in the IEPs." (ECF No. 44-1, at 32). The court addressed this argument under its Issue 4 analysis.

**6. Whether Defendants denied C.L.-W. a FAPE when they failed to grant Plaintiff's request for an Independent Education Evaluation or file a due process complaint to defend their decision not to grant the request**

Under 34 C.F.R. § 300.502(b)(1), a "parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." When a parent requests an IEE, the school district must either "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate" or "[e]nsure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria." 34 C.F.R. § 300.502(b)(2).

Plaintiff contends that Defendants violated the IDEA by denying her request for psychological, speech and language, and occupational therapy IEEs.[9]  (ECF No. 44-1, at 33).  Although Plaintiff sought private evaluations for C.L.-W., she argues that "[t]he delay in authorizing IEEs for [C.L.-W.] delayed [his] ability to receive appropriate special education and related services and delayed [her] ability to request an update of the IEPs to reflect [C.L.-W.'s] additional needs." (ECF No. 44-1, at 33).  Defendants respond that even if they committed a procedural error, Plaintiff failed to show harm to C.L.-W.'s education.  (ECF No. 47-1, at 32).  In her opposition, Plaintiff counters that she did show harm to C.L.-W.'s education with respect to Defendants' failure to fund an occupational therapy IEE because Ms. Neway, the occupational therapist who evaluated C.L.-W., testified that C.L.-W. needed one-on-one occupational therapy services to improve his fine motor integration, which "impacts his handwriting, his ability to communicate with teachers[,] to complete assignments"; manual dexterity, which "impact[s] his ability to do every day functional activities in and outside of an academic setting"; and visual-motor skills, which "can impact his handwriting skills" and "math skills."  (ECF No. 43-1, at 12-15; *see also* ECF No. 49-1, at

---

[9] Defendants initially denied Plaintiff's request to fund psychology, speech and language, and occupational therapy IEEs. (ECF No. 42-57, at 279).  Defendants later agreed to fund a psychological IEE.  (ECF No. 42-60, at 101).

25-27).  Plaintiff also asserts that Defendants' failure to provide
an occupational therapy IEE contributed to C.L.-W.'s performance
at three to five years below grade level in "integrating eye-hand
coordination and visual motor skills including handwriting,
scissoring, and copying activities." (ECF No. 49-1, at 27) (citing
ECF No. 42-57, at 58).

The ALJ found that Defendants procedurally violated the IDEA
by failing to approve Plaintiff's request for an occupational
therapy IEE or file a due process complaint to defend their
decision.  (ECF No. 1-1, at 177).  Because the ALJ incorrectly
determined that Defendants agreed to fund a speech and language
IEE for C.L.-W., he did not include in his analysis the failure to
either fund or defend their decision regarding the speech and
language IEE.  The ALJ found no deprivation of a FAPE with respect
to the failure to fund or defend the decision regarding the
occupational therapy IEE because Plaintiff "presented no proof
that the failure to approve the request resulted in any educational
deficit, resulted in the failure to make academic progress, or
contributed to the failure of [C.L.-W.] to reach any goal or
objective in his" IEPs.  (ECF No. 1-1, at 177).

The Fourth Circuit has found a procedural violation when a
"school district provided no testing in response to [the] parents'
requests for an evaluation until after they had filed a formal
complaint" and "declined to test even after [the] parents supplied

it with the results of" an IEE.  *T.B., Jr.*, 897 F.3d at 573.  It found no denial of a FAPE, though, because the record established that the child "simply does not want to go to school," and therefore "no type or amount of special education services would have helped [him] achieve a FAPE."  *Id.* at 575, 578.

Here, the ALJ correctly determined that a procedural violation occurred.  With respect to Plaintiff's request that Defendants fund speech and language and occupational therapy IEEs, Defendants neither "[f]ile[d] a due process complaint to request a hearing to show that its evaluation is appropriate" nor "[e]nsure[d] that an independent educational evaluation is provided at public expense."  34 C.F.R. § 300.502(b)(2); (ECF No. 42-60, at 101).

The ALJ also correctly determined that Plaintiff has not shown that the procedural violation denied C.L.-W. a FAPE.  First, Plaintiff introduced no evidence that Defendants' failure to fund a speech and language IEE negatively affected his education.  Ms. Marcella Coleman, M.S., a speech and language pathologist contractor who works for Defendants, testified that C.L.-W. "would be classified as a child with a mild language disorder," (ECF No. 43-52, at 6), and that "with consistent attendance, he would have made progress.  And I base that on the progress he made with Ms. Moulton and that he was making with me[,]" (ECF No. 43-52, at 12).  Instead, she testified that every time she attempted to

69

observe C.L.-W. in class, he was absent.  (ECF No. 43-52, at 11).

Plaintiff has not introduced evidence refuting Ms. Coleman's

conclusion that C.L.-W.'s attendance issues, not Defendants'

failure to fund a speech and language IEE, caused him not to

progress as quickly as he could have.  The Fourth Circuit has found

no denial of FAPE when an expert witness testified that a child's

extensive absences, rather than anything the school district did,

caused his regression.  *O.S.*, 804 F.3d at 361.  Additionally, at

the October 29, 2020 IEP meeting, Ms. Coleman recommended speech

and language consults and class observation instead of therapy

because C.L.-W. *did* improve in her four sessions with him.  (ECF

No. 43-52, at 10, 12).

Second, although Plaintiff introduced some evidence that

C.L.-W. performed below average for his age in fine motor

precision, fine motor integration, manual dexterity, and visual

perception motor skills, (ECF No. 42-57, at 56, 58), she has not

shown that Defendants' failure to fund an occupational therapy

IEE, specifically, caused C.L.-W.'s below-grade-level performance.

Moreover, failure to perform at grade level does not necessarily

indicate that the school district is not providing any educational

benefit.  *See Endrew F.*, 580 U.S. at 387-88 ("A child's IEP need

not aim for grade-level advancement if that is not a reasonable

prospect."); *see also Daniel R.R. v. State Bd. of Educ.*, 874 F.2d

1036, 1047 (5th Cir. 1989) ("[S]ome handicapped children may not

be able to master as much of the regular education curriculum as their nonhandicapped classmates.  This does not mean, however, that those handicapped children are not receiving any benefit from regular education.").  While Ms. Neway recommended 30 minutes of occupational therapy in a school-based setting per week, she did not testify that Defendants' failure to fund an occupational therapy IEE caused C.L.-W. educational detriment.  (ECF Nos. 43-1, at 27; 43-3, at 16).  Ms. Lauren White, M.A., Defendants' itinerant occupational therapist, testified that Defendants only provide occupational therapeutic counseling when an evaluation contains evidence that it is necessary, and Ms. Neway's report did not include such evidence.  (ECF No. 43-49, at 17).  Ms. White also testified that when the IEP team considered Ms. Neway's report at the April 2021 IEP meeting, the IEP team did not accept it because "there were no concerns in the school related to occupational therapy."  (ECF No. 43-49, at 23).  The IEP team's decisions to decrease C.L.-W.'s speech and language services to only consults and not provide occupational therapy, although ex post, further support the ALJ's conclusion that Defendants' failure to fund speech and language and occupational therapy IEEs did not cause harm to C.L.-W.'s education.  Plaintiff did not meet her burden in proving that Defendants' failure to fund or file a due process complaint to defend their decisions not to fund speech

and language and occupational therapy IEEs effected a denial of a FAPE.

**IV.  Conclusion**

For the foregoing reasons, Plaintiff's motion for summary judgment will be denied and Defendants' cross motion for summary judgment will be granted.  A separate order will follow.


_____ /s/ _____
DEBORAH K. CHASANOW
United States District Judge